# UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF FLORIDA
# TAMPA DIVISION

SCOTT SMITH,
BORIS NULMAN, and
MICHAEL ROZENBERG,

Civil Action No.: 8:2020 cv 250 T 60 cpT

**JURY TRIAL DEMANDED**

*Plaintiff,*

v.

TRANSPORTATION SECURITY
ADMINISTRATION (TSA);

DAVID PEKOSKE, Administrator, TSA,
in his official capacity;

U.S. CUSTOMS AND BORDER PROTECTION (CBP);

KEVIN McALEENAN, Commissioner, CBP,
sued in his official capacity;

UNITED STATES OF AMERICA;

ERIC THELANDER, Agent,
Homeland Security Investigations (HSI),
sued in his official capacity and as an individual,

*Defendants.*

2020 JAN 31 PM 3:40
CLERK, US DISTRICT COURT
MIDDLE DISTRICT FLORIDA
TAMPA, FLORIDA

FILED

## COMPLAINT FOR RETURN OF SEIZED CURRENCY AND
## CONVERSION OF MISSING MONEY

COMES NOW, Plaintiff BORIS NULMAN ("Mr. Nulman"), SCOTT

SMITH ("Mr. Smith"), and MICHAEL ROZENBERG ("Mr. Rozenberg"), in this

complaint for the immediate return of $181,500 in U.S. currency seized by the U.S.

TRo J 9859
$400

Customs and Border Protection ("CBP"). The complaint for the return of $181,500 in U.S. currency that was seized, as well as interest, attorney fees, and costs, is based on conversion of property, Federal Rule of Criminal Procedure 41(g), this Court's general equity jurisdiction under 28 U.S.C. § 1331, violations of the Civil Asset Forfeiture Reform Act ("CAFRA"), 18 U.S.C. § 983, and the Attorney General's regulation promulgated thereunder, 28 C.F.R. § 8.13, as well as the right to be free of unreasonable detentions and searches under the Fourth Amendment. Furthermore, Plaintiffs brings a Fourth Amendment claim for compensatory damages under *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971).

In support of this complaint, the Plaintiffs show the following:

1.    On September 20, 2019, Mr. Scott and Mr. Rozenberg entrusted Mr. Nulman with $191,500 in U.S. currency to purchase pre-owned tractor-trailer trucks for their business, FGL Transport, Inc.

2.    Mr. Nulman intended to take the $191,500 in U.S. currency to Cleveland, Ohio, so that the cash could be used to purchase pre-owned tractor-trailer trucks that could be used for FGL Transport, Inc.

3.    The $191,500 in U.S. currency entrusted to Mr. Nulman on September 20, 2019, came from the profits of FGL Transport, Inc., which is owned by Mr. Rozenberg and Mr. Smith, and from FGL Holdings, LLC, which is owned by Mr. Smith.

2

4.     FGL Transport, Inc., is a licensed trucking company that owns and operates a fleet of tractor trailer trucks used to transport goods in interstate and intrastate commerce.

5.     As part of the normal course of business, Mr. Smith and Mr. Rozenberg purchase pre-owned tractor trailer trucks when needs to update part of the fleet for FGL Transport, Inc.

6.     Using U.S. currency to purchase pre-owned tractor trailer trucks from owner-operators is a common business practice within the trucking industry.

7.     Neither state nor federal law prohibits using U.S. currency to purchase pre-owned tractor trailer trucks.

8.     The $191,500 in U.S. currency entrusted to Mr. Nulman on September 20, 2019, was lawfully earned and intended for lawful purposes.

9.     The $191,500 in U.S. currency entrusted to Mr. Nulman on September 20, 2019, was withdrawn from the business account of FGL Holdings, LLC, during the normal course of business by Mr. Smith with the intention of using it to purchase tractor trailers trucks for FGL Transport, Inc.

10.    Mr. Smith and Mr. Rozenberg can afford to use cash to purchase tractor trailer trucks to upgrade part of their fleet.

11.    On September 20, 2019, Mr. Nulman entered the TSA Pre-Check security area in preparation for boarding a domestic flight at Tampa's International

3

Airport ("the airport") headed for Cleveland, Ohio, with the $191,500 in U.S. currency in his possession.

12.    When Mr. Nulman went through TSA transportation security screening at the Tampa International Airport, TSA Screeners pulled aside Mr. Nulman's carry-on luggage solely because they observed via their scan that that the luggage contained a "large" amount of cash.

13.    After the TSA Screeners completed the security screening of Mr. Nulman's carry-on luggage containing the cash, they told him they were going to hold on to his U.S. currency and carry-on luggage until law-enforcement officers arrived.

14.    Mr. Nulman was not permitted to retrieve the U.S. currency and carry-on luggage and continue to the gate to board the flight.

15.    While being detained by the TSA Screeners, Mr. Nulman did not feel free to leave and believed he was being detained by TSA.

16.    Even if TSA had told him he was permitted to leave, it would not have been practical or reasonable for Mr. Nulman to leave the area without the U.S. currency, the carry-on luggage, and its contents. Mr. Nulman was, in fact, effectively seized along with his U.S. currency, the carry-on luggage, and its contents by the TSA Screeners.

17.    As determined by TSA's transportation security screening, Mr. Nulman did not have any illegal drugs, any type of illegal contraband, or any items that could threaten transportation security in his luggage or on his person such as weapons, explosives, or incendiaries.

18.    Nothing about Mr. Nulman's behavior gave rise to any reasonable suspicion that he was engaged in any suspicious or illegal activity.

19.    After the initial detention by TSA Screeners, Mr. Nulman's detention continued as state and federal law enforcement officers surrounded him to continue the interrogation.

20.    Even if any of the law enforcement officers or agents had told Mr. Nulman that he was free to leave, Mr. Nulman could not realistically leave the area without the U.S. currency, the carry-on luggage, and its contents. Mr. Nulman was, in fact, effectively seized along with the U.S. currency, the carry-on luggage, and its contents, by the various law enforcement officers including an agent with CBP.

21.    Even after the prolonged detention at the security checkpoint, instead of being able to leave with the U.S. currency, the carry-on luggage, and its contents to board the flight, Mr. Nulman was told that he would be escorted to the airport police station along with the U.S. currency, the carry-on luggage, and its contents.

22.   Mr. Nulman was detained for more than 45 minutes at the checkpoint screening area in front of other travelers before being escorted to the airport police station.

23.   Mr. Nulman was escorted through crowded parts of the airport while being detained by several law enforcement officers or federal agents with CBP.

24.   Mr. Nulman found the detention at the checkpoint and while being escorted through the airport to be extremely embarrassing and humiliating because the way the detention was conducted made it appear to the other travelers that Mr. Nulman was either under arrest or being detained for having done something illegal.

25.   Mr. Nulman felt like he had no choice but to comply with the demands of the CBP Agent who escorted him, the U.S. currency, his carry-on luggage, and its contents to the airport police station.

26.   Mr. Nulman did not feel free to leave but believed he was required to go to the airport police station.

27.   When asked to show various documents or answer questions, Mr. Nulman believed that he had no choice but to comply with the demands, answer the questions, and show the documents.

28.   After being escorted to the airport police station, several law enforcement officers including Agent Eric Thelander, with Homeland Security

Investigations (HSI) (hereinafter "Agent Thelander"), continued the prolonged detention of Mr. Nulman, the U.S. currency, and the carry-on luggage and its contents.

29.   The total amount of U.S. currency initially seized by CBP while Mr. Rozenberg was being detained totaled $191,500.

30.   Mr. Nulman demanded that Agent Thelander count the money and offered to count the money for Agent Thelander to confirm the amount of money being seized.

31.   During the detention at the airport police station, CBP Agent Eric Thelander allowed Mr. Nulman to leave with only $10,000 in cash, but Agent Thelander seized the remaining $181,500 which was not returned to Mr. Nulman.

32.   Agent Thelander seized the $181,500 in U.S. currency and no portion of that cash was returned to Mr. Nulman.

33.   Agent Thelander wrote a receipt to Mr. Nulman that said: "MONEY CONTAINED IN 2 BAGS. ESTIMATED VALUE IS $181,500.00."

34.   Since the original amount seized during the initial detention of Mr. Rozenberg was $191,500 and CBP Agent Thelander allowed Mr. Nulman to leave with $10,000, Agent Thelander continued to maintain custody of the $181,500 of the U.S. currency ("the seized cash") even after Mr. Rozenberg left the airport police station.

7

35.    After being released from the airport police station, Mr. Nulman was finally permitted to rebook his flight because he had already missed the flight that he intended to take that day which caused him additional expense and inconvenience.

36.    The Transportation Security Administration ("TSA") and U.S. Customs and Boarder Protection ("CBP") uses policies or practices of seizing cash from travelers at the Tampa International Airport based solely on the amount of cash being carried without any reasonable suspicion or probable cause of criminal activity.

37.    TSA and CBP use systematic policies or practices of seizing cash from air travelers based solely on the presence of what these agencies believe to be "large" or "suspicious" amounts of cash.

38.    TSA's detention of Mr. Nulman and his property exceeded TSA's statutory authority, which is limited to transportation security and does not extend to investigating potential crimes unrelated to transportation security.

39.    TSA's detention of Mr. Nulman violated the Fourth Amendment of the United States Constitution for warrantless searches and seizures during prolonged detentions.

8

40.    CBP's detention of Mr. Nulman violated the Fourth Amendment of the United States Constitution for warrantless searches and seizures during a prolonged detention.

41.    CBP has continued to hold $181,500 in seized cash from Mr. Nulman since September 20, 2019, and has taken actions attempting to permanently keep the money using civil forfeiture procedures.

42.    Neither Mr. Nulman, Mr. Smith, or Mr. Rozenberg have been arrested for or charged with a crime.

43.    Mr. Nulman, Mr. Smith, and Mr. Rozenberg (hereinafter the "Plaintiffs") each have a possessory and ownership interest in the seized cash.

44.    Shortly after the seized cash was taken by CBP on September 20, 2020, Mr. Nulman, Mr. Scott and Mr. Rozenberg retained the undersigned attorney to represent them in the effort to recover the seized cash.

45.    On September 26, 2019, each of the three Plaintiffs, through the undersigned attorney, submitted a verified claim form that complied with CAFRA requesting that CBP refer the case to the U.S. Attorney's Office (USAO) for court action, thus electing a judicial forfeiture proceeding rather than an administrative forfeiture proceeding (hereinafter "the first CAFRA verified claims").

46.    The first CAFRA verified claims were sent via certified mail return receipt requested on September 26, 2019, to Mr. Robert M. Del Toro, Fines,

Penalties, & Forfeitures Officer, U.S. Customs and Border Protection, Fines,

Penalties and Forfeitures, 1624 E. 7th Avenue, Suite 101, Tampa, Florida 33605,

and were received by CBP on October 3, 2019.

47.    The first CAFRA verified claims were filed with the appropriate

official after the seizure pursuant to 18 U.S.C. § 983(a)(2)(A) and otherwise

complied with the requirements of 18 U.S.C. § 983(a)(2)(C).

48.    Without acknowledging the first verified claims, on October 9, 2019,

Robert Del Toro, Fines, Penalties, & Forfeitures Officer sent a notice of seizure

which alleged that only $159,950 in U.S. currency had been seized (hereinafter

"notice of seizure").

49.    The notice of seizure also indicated that the seizure involved an

alleged violation of the provisions of Title 18, U.S.C., section 981(a)(1)(C) as

proceeds of the manufacture, sale or distribution of a controlled substance which is

identified as "specified unlawful activity" under Title 18, United States Code,

section 1956(c)(7).

50.    No explanation was provided to explain the difference between the

$181,500.00 described in the receipt and the $159,950 listed in the notice of

seizure.

51.    Upon information and belief, since Agent Thelander actually seized $181,500 that was not returned to Mr. Nulman, it appears that $21,550 of the Plaintiffs' seized cash has gone missing from CBP's custody.

52.    On November 4, 2019, the undersigned attorney then submitted again a verified claim for each of the Plaintiffs, Mr. Nulman, Mr. Smith, and Mr. Rozenberg in response to the notice of seizure (hereinafter "the second CAFRA verified claims"), requesting for a second time that CBP refer the case to the U.S. Attorney's Office (USAO) for court action, thus electing a judicial forfeiture proceeding rather than an administrative forfeiture proceeding.

53.    The second CAFRA verified claims were send via USPS Certified Mail and were each delivered and signed for on November 6, 2019, at U.S. Customs and Boarder Protection, Attn. FP&F Office, 1624 E. 7TH AVE STE 101, Tampa FL 33605-3769.

54.    On November 25, 2019, Robert Del Toro sent a letter to the undersigned attorney complaining that the first CAFRA verified claims were filed before formal notice of the initiation of forfeiture had been provided, that the claims were "premature and are therefore, invalid." No legal basis was provided for this conclusion in the letter.

55.    The first CAFRA verified claim was not premature or invalid under 18 U.S.C. § 983 or any other relevant provision of CAFRA.

56.     Within the 90-day period required under CAFRA, the USAO has declined to pursue forfeiture of the seized cash and the government failed to timely file a forfeiture complaint within the 90-day period required under 18 U.S.C. § 983(a)(3)(A).

57.     The 90-day period begins to run "after a claim as been filed," which in this case was on October 3, 2019, when the first CAFRA verified claim from each Plaintiff was received.

58.     For purposes of determining the 90 day period, 18 U.S.C. § 983(a)(2)(A) provides that "[a]ny person claiming property seized in a nonjudicial civil forfeiture proceeding under a civil forfeiture statute may file a claim with the appropriate official after the seizure."

59.     Although the claim must be filed *after* the seizure, nothing in the rules requires the person making the claim to wait until *after* the notice is provided.

60.     Furthermore, as explained in 18 U.S.C. § 983(a)(2)(D), as long as the verified claim complies with the requirements of 18 U.S.C. § 983(a)(2)(C), the "claim need not be made in any particular form."

61.     Since within the 90-day period required under CAFRA, the USAO has declined to pursue forfeiture of the seized cash and the government failed to timely file a forfeiture complaint within the 90-day, CAFRA automatically

required that CBP "promptly release" the seized property as explained in 18 U.S.C. § 983(a)(3)(B) and 28 C.F.R. § 8.13.

62.   This Complaint is filed against TSA, DAVID PEKOSKE, Administrator, TSA, in his official capacity; U.S. CUSTOMS AND BORDER PROTECTION (CBP); KEVIN McALEENAN, Commissioner, CBP, sued in his official capacity; the United States of America; and ERIC THELANDER, Agent, Homeland Security Investigations (HSI), sued in his official capacity and as an individual.

63.   Plaintiffs demand the immediate return of the $181,500 of seized cash, with interest, because the government has failed to timely file its forfeiture complaint and is thus automatically required to return the seized cash under 18 U.S.C. § 983(a)(3)(B).

64.   Furthermore, CBP should be ordered to pay interest as well as reasonable attorney fees and costs necessary to file and litigate this action.

65.   CBP's continued and ongoing seizure of the cash constitutes an ongoing injury to Mr. Nulman, Mr. Smith, and Mr. Rozenberg.

66.   Throughout the time the cash has been in CBP's possession, Mr. Nulman, Mr. Smith, and Mr. Rozenberg have been unable to make use of their money.

67.   But for the seizure, Mr. Smith, and Mr. Rozenberg would not have lost business opportunities and incurred additional business expenses.

68.   Mr. Smith and Mr. Rozenberg are suffering from the deprivation of the financial resources to buy additional tracker trailers for their business.

69.   But for the seizure of the cash, Mr. Smith and Mr. Rozenberg would have been able to purchase the additional vehicles needed to operate their businesses.

70.   Mr. Nulman, Mr. Smith and Mr. Rozenberg continue to suffer emotional distress, pain, and suffering caused by the ongoing deprivation of the $181,500 in seized cash.

71.   Mr. Nulman suffered and continues to suffer emotional distress, pain, and suffering caused by the insult and humiliation of the circumstances and manner of the unlawful detention and seizure of him and his property.

### Jurisdiction & Venue

72.   This Court has jurisdiction over this action under 28 U.S.C. § 1331, as the claims of the Plaintiffs arise under federal law.

73.   Plaintiffs bring their individual claim for the immediate return of their seized property based on conversion of property and under Federal Rule of Criminal Procedure 41(g), this Court's general equity jurisdiction under 28 U.S.C. § 1331, violations of the Civil Asset Forfeiture Reform Act ("CAFRA"), 18 U.S.C.

§ 983, and the Attorney General's regulation promulgated thereunder, 28 C.F.R. §

8.13, as well as the right to be free of an unreasonable detentions and searches

under the Fourth Amendment. Furthermore, Plaintiffs brings a Fourth Amendment

claim for compensatory damages under *Bivens v. Six Unknown Named Agents*, 403

U.S. 388 (1971).

74.     Venue is proper in the United States District Court for the Middle

District of Florida, Tampa Division, under 28 U.S.C. §§ 1391(b)(2) and

1391(e)(1)(B), as well as Federal Rule of Criminal Procedure 41(g), because the

seizure of Plaintiff's property occurred at the Tampa International Airport in

Tampa, FL.

75.     The Tampa International Airport in Tampa, FL, is located in the

Tampa Division, Middle District of Florida.

### The Parties

76.     Plaintiff Boris Nulman (hereinafter "Mr. Nulman") is an adult citizen

of the United States and a resident of Brooklyn, N.Y., in Kings County, and has a

possessory interest and a joint ownership interest in the $181,500 of the seized

cash.

77.     Plaintiff Scott Smith (hereinafter "Mr. Smith") is an adult citizen of

the United States and a resident of Riverview, FL, in Hillsborough County, and has

a possessory interest and a joint ownership interest in the $181,500 of the seized cash.

78.    Plaintiff Michael Rozenberg (hereinafter "Mr. Rozenberg") is an adult citizen of the United States and a resident of Hollywood, FL, in Broward County, and has a possessory interest and a joint ownership interest in the $181,500 of the seized cash.

### Defendant Agent Eric Thelander

79.    Upon information and belief, the Agent Eric Thelander, (hereinafter "Agent Thelander") seized $181,500 in U.S. currency from Mr. Nulman on September 20, 2019, in violation of Mr. Nulman's Fourth Amendment rights.

80.    Although Agent Thelander wrote his name on the receipt, it is difficult to tell if his name is "Eric Thelander," "Erik Thelander," or "Erick Thelander."

81.    Agent Thelander is sued in his individual capacity for the conversion of $21,550 and pursuant to *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971) for the Fourth Amendment Violations.

### Defendant TSA

82.    Defendant TSA has statutory authority to operate under 49 U.S.C. § 114, which makes the agency "responsible for security in all modes of transportation" including the authority to conduct air transportation security screening operations as provided in 49 U.S.C. § 114(e).

16

83. TSA is statutorily charged with developing "policies, strategies, and plans for dealing with threats to transportation security." 49 U.S.C. § 114(f)(3).

84. TSA's authority over air transportation security is set forth in 49 U.S.C. § 44903.

85. TSA's authority to screen passengers and property is set forth in 49 U.S.C. § 44901.

86. TSA's statutory authority is so narrowly limited to these purposes that Congress felt it was necessary to specifically authorize TSA to keep loose change and other money that is incidentally left behind at transportation security screening checkpoints. See 49 U.S.C. § 44945.

87. Although transportation security screenings at airport checkpoints by TSA Screeners are administrative searches conducted for the limited purpose of ensuring transportation security, the searches are not to be conducted for general law-enforcement purposes.

88. TSA's screening procedures are designed to assess whether air passengers or their luggage are a threat to transportation security by screening for dangerous items.

89. The scope of TSA transportation security screenings is limited to "the inspection of individuals and property for weapons, explosives, and incendiaries." 49 C.F.R. § 1540.5; *see also* 49 U.S.C. § 44902.

90.    Air travelers "may not have a weapon, explosive, or incendiary, on or about the individual's person or accessible property." 49 C.F.R. § 1540.111.

91.    A weapon, explosive, or incendiary is specifically defined by TSA in an exhaustive list at 70 Fed. Reg. 9878 (Mar. 1, 2005), available at https://www.govinfo.gov/content/pkg/FR- 2005-03-01/pdf/05-3977.pdf.

92.    TSA's exhaustive list of defined weapons, explosives, or incendiaries does not include "cash," "currency," or "money."

93.    Once TSA Screeners have determined that none of the defined prohibited items are present and that the traveler and their carry-on luggage and personal effects do not present a threat to transportation security, the transportation security screening has concluded, and TSA Screeners do not have authority to further detain the traveler, their carry-on luggage, or their personal effects.

94.    In contravention of this limited authority and duties, upon information and belief, TSA Screeners followed a TSA policy or practice of seizing travelers' currency, carry-on luggage, personal effects, and/or persons after TSA Screeners have concluded the transportation security screening and determined that no items that pose a threat to transportation security are present.

95.    Upon information and belief, TSA Screeners make these seizures without regard for whether reasonable suspicion or probable cause exists for the seizures.

96.    Upon information and belief, TSA Screeners make these seizures in order to hold the traveler's currency, carry-on luggage, personal effects, and/or person until law-enforcement officers can arrive and investigate.

### Defendant David P. Pekoske

97.    Defendant David P. Pekoske is the current Administrator of TSA. As Administrator of TSA, Pekoske is responsible for overseeing the operations of TSA, including the policy or practice at issue here.

98.    Defendant David P. Pekoske is sued in his official capacity.

### U.S. Customs and Border Protection

99.    Defendant U.S. Customs and Border Protection ("CBP") is a federal agency charged with enforcing U.S. customs laws at ports of entry and departure from the United States.

100.    Upon information and belief, each year, some of the forfeiture cases CBP refers to the relevant U.S. Attorney's Office (USAO) for judicial proceedings are either declined by the USAO, which does not timely file a forfeiture complaint, or the USAO otherwise fails to timely file a forfeiture complaint under 18 U.S.C. § 983(a)(3) and does not take any other action under 18 U.S.C. § 983(a)(3) that would avoid its obligation to file a forfeiture complaint within 90 days after a claim has been filed, namely: obtaining an extension from the court in the district in which the complaint would be filed, obtaining a criminal indictment containing

an allegation that the property is subject to forfeiture and taking the steps necessary

to maintain custody of the property, or returning the property pending filing of a

complaint.

101. When the circumstances described above in the preceding paragraph

occur, CBP is automatically required by both 18 U.S.C. § 983 (a)(3)(B), and the

Attorney General's regulation promulgated thereunder, 28 C.F.R. § 8.13, to

promptly release the property by promptly notifying the person with a right to

immediate possession of the property and informing them to contact the property

custodian for release of the property (unless there is an independent basis for

continued custody of the property).

102. Therefore, only two, very limited conditions that may be imposed on

the person with the right to immediate possession of the property at this stage of

the CAFRA process, and both are simply practical requirements to ensure that the

property is promptly released to the correct person:

    a. First, that person must "contact the property custodian within the

       specified period for release of the property," 28 C.F.R. § 8.13(b); and

    b. Second, that person must, if requested, "present[] . . . proper

       identification" so that the property custodian may "verify the identity

       of the person who seeks the release of the property" to confirm that

they are "the person to whom the property should be released." 28 C.F.R. § 8.13(b)-(c).

103. In this case, CBP is automatically required to "promptly release" the seized currency under CAFRA without any such preconditions because CAFRA prohibits CBP from "tak[ing] any further action to effect the civil forfeiture of such property in connection with the underlying offense." 18 U.S.C. § 983(a)(3)(B).

104. CBP has no authority to continue detaining the seized cash and must return it immediately.

### Defendant Kevin McAleenan

105. Defendant Kevin McAleenan is the current Commissioner of CBP.

106. As Commissioner, Defendant McAleenan is responsible for overseeing the operations of CBP, including the policies or practices that are challenged in this litigation.

107. Defendant McAleenan is sued in his official capacity.

### Defendant United States of America

108. Defendant United States of America is the national federal government established by the United States Constitution. As such, it is subject to limitations imposed by the United States Constitution—including, as relevant here, the Fourth Amendment.

109.   The statutory and constitutional violations at issue involve the actions of federal agencies and employees and are therefore ultimately chargeable to the federal government itself.

## COUNT I:

## Conversion of Property

(Against Agent Thelander)

110.   Plaintiff re-alleges the allegations set forth in Paragraphs 1-109 above and incorporates same herein by reference.

111.   At all times relevant to this litigation, Defendant Agent Thelander owed Plaintiffs' a duty to not convert to his own use or benefit any portion of the $181,500 in U.S. currency seized from Mr. Nulman on September 20, 2019.

112.   Upon information and belief, Defendant Agent Thelander breached that duty for a portion of the seized cash that appears to be missing from CBP custody and such breaches were the actual and proximate cause of harm to the Plaintiffs.

113.   Accordingly, Defendant Agent Thelander is liable in damages to Plaintiffs for an amount of $21,550 plus interest, with the exact amount to be proven at trial.

## COUNT II

## Claim Under Federal Rule of Criminal Procedure 41(g) and 28 U.S.C. § 1331

## for Return of Plaintiffs' Property Currently Held

## in Violation of the Fourth Amendment

(Against CBP, Kevin McAleenan, Commissioner, Agent Thelander)

114.   Plaintiff re-alleges the allegations set forth in Paragraphs 1-109 above and incorporates same herein by reference.

115.   Plaintiffs bring this claim for the return of their seized cash (or an equivalent amount in U.S. currency) against CBP, Kevin McAleenan, Commissioner, Agent Thelander and the United States of America under Federal Rule of Criminal Procedure 41(g), this Court's general equity jurisdiction under 28 U.S.C. § 1331, and the Fourth Amendment to the United States Constitution.

116.   Under 18 U.S.C. § 983(a)(3)(A), the federal government had 90 days from the filing of Plaintiff's First CAFRA verified claim on October 3, 2019, to file a complaint for forfeiture.

117.   The government's deadline to file a forfeiture complaint thus expired on January 1, 2020.

118.   During that 90 day period, the government never filed a forfeiture complaint.

119.   The government also did not take any other action under 18 U.S.C. §

983(a)(3) that would avoid its obligation to file a forfeiture complaint within 90

days after a claim has been filed, namely: obtaining an extension from the court in

the district in which the complaint would be filed, obtaining a criminal indictment

containing an allegation that the property is subject to forfeiture and taking the

steps necessary to maintain custody of the property, or returning the property

pending filing of a complaint.

120.   Under CAFRA, if the government fails to file a complaint "before the

time for filing a complaint has expired" (and does not obtain a criminal indictment

containing an allegation that the property was subject to forfeiture), "the

Government shall promptly release the property pursuant to regulations

promulgated by the Attorney General and may not take any further action to effect

the civil forfeiture of such property in connection with the underlying offense." 18

U.S.C. § 983(a)(3)(B)(ii) (emphasis added).

121.   Thus, once the United States failed to timely file a forfeiture

complaint in this matter (or obtain a criminal indictment containing an allegation

that the property was subject to forfeiture), CBP was obligated under 18 U.S.C. §

983(a)(3)(B) to "promptly release the property pursuant to regulations promulgated

by the Attorney General" and, under those regulations, CBP was obligated to

"promptly notify the person with a right to immediate possession of the property"

by "informing that person to contact the property custodian within a specified period for release of the property." 28 C.F.R. § 8.13(b).

122. Once the United States failed to timely file a forfeiture complaint in this matter (or obtain a criminal indictment containing an allegation that the property was subject to forfeiture), CBP was also obligated to "not take any further action to effect the civil forfeiture of such property in connection with the condition of releasing the seized property."

123. CBP's continued detention of the seized cash is both ultra vires and in direct violation of CAFRA's commands.

124. Plaintiffs seized cash must be returned immediately because the government failed to timely file a complaint for forfeiture within 90 days after the Plaintiffs filed their claim under CAFRA.

125. Thus, as required by CAFRA and the Attorney General's regulation, CBP must "promptly return the property" to the person who, now that the deadline has been missed, has the "right to immediate possession." *See* 18 U.S.C. § 983(a)(3)(B); 28 C.F.R. § 8.13.

126. Plaintiffs are each aggrieved, injured, and harmed by the unlawful and unconstitutional seizure of their property—the seized cash—and by the continued deprivation of that property.

127.   CBP's seizure and continued retention of Plaintiffs' seized cash violated and continues to violate the Fourth Amendment because the warrantless seizure and detention were and remain without probable cause to believe that Mr. Nulman or the other Plaintiffs engaged in any criminal activity, or that the cash was connected to any criminal activity, and no exception to the warrant requirement applied or applies to the initial seizure or the retention of the seized cash.

## COUNT III

### Claim for Compensatory Damages Under the Fourth Amendment

### (Against Agent Thelander)

128.   The Plaintiffs re-allege and incorporate by reference each and every allegation set forth in preceding paragraphs 1-109.

129.   The Plaintiffs bring this claim for compensatory damages against Defendant CBP Agent Thelander in his individual capacity, under *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971), and the Fourth Amendment to the United States Constitution.

130.   Defendant Agent Thelander violated Mr. Nulman's clearly established Fourth Amendment right to be free from unreasonable searches and seizures by seizing his cash without a warrant or probable cause.

131.   As a direct and proximate result of Agent Thelander's unconstitutional actions, Plaintiffs' suffered injuries, as set forth in the preceding paragraphs and as may further be developed in discovery or at trial.

132.   An award of compensatory damages plus interest—in amounts to be determined in discovery or at trial—is necessary to remedy the injuries caused by Agent Thelander's violation of Plaintiffs' Fourth Amendment rights.

### Request for Relief

WHEREFORE, Plaintiffs respectfully requests that this Honorable Court award the following relief:

A. Order Defendants CBP to immediately return all of Plaintiffs seized cash with interest under Federal Rule of Criminal Procedure 41(g);

B. Award Plaintiffs compensatory damages plus interest—in an amount to be proven in discovery or at trial—against Agent Thelander for his violations of the Plaintiffs' Fourth Amendment rights and conversion of property;

C. Enter an award against all Defendants allowing Plaintiffs to recover their attorney fees, costs, and expenses in this action under 28 U.S.C. § 2412; and

D. Award any further equitable or legal relief the Court may deem just and proper.

## Jury Demand

Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs demand a trial by jury of all issues so triable.

Dated: January 31, 2020.

Respectfully submitted,

/s/ Leslie M. Sammis
Leslie M. Sammis
Attorney at Law
Florida Bar No.: 0185825
1005 N. Marion St.
Tampa, FL 33602
Tel: 813-250-0500
Email: lsammis@sammislawfirm.com

28

## CERTIFICATE OF SERVICE

I hereby certify that, on this 31[th] day of January, 2020, I electronically filed the foregoing Complaint, with the Clerk of Court using the CM/ECF system. I further certify that I caused a copy of the foregoing Complaint, and the Summons in this civil action, to be sent by certified mail to the following addresses:

U.S. Attorney's Office
Attn: James Muench
Middle District of Florida
Tampa Division
400 N Tampa St Ste 3200
Tampa, FL 33602-4798

Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

Agent Eric Thelander
Homeland Security Investigations
2203 North Lois Avenue Suite 600
Tampa, FL, 33607

U.S. Customs and Border Protection
Mr. Robert M. Del Toro
1624 E. 7th Ave. STE 101
Tampa, FL 33605-3769

Commissioner Kevin McAleenan
U.S. Customs and Border Protection
1300 Pennsylvania Ave. NW
Washington, DC 20229

Mr. David Pekoske,
Transportation Security Administration
Office of Chief Counsel, TSA-2
601 S. 12th St.
Arlington, VA 20598-6002

/s/ Leslie M. Sammis
Leslie M. Sammis